# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARL SMITH, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | No. 15-cv-6516 |
| CITY OF PHILADELPHIA, | : | |
| DEPARTMENT OF LICENSES | : | |
| AND INSPECTIONS, | : | |
|     Defendant. | : | |

MCHUGH, J.                                                                                                              JANUARY 19, 2018

## MEMORANDUM

This is an employment discrimination case brought by a trainee in the City of Philadelphia Department of Licenses and Inspections ("L & I") who was not offered permanent employment. The claim is one for religious discrimination, and presents in an unusual way. Plaintiff Carl Smith, a Catholic, alleges that he was discriminated against by a superior, also a Catholic, because he expressed disdain for his superior's more stringent views of the faith. According to Plaintiff, that refusal led to a dispute which in turn led to a negative review that then prevented him from being hired at the end of his training period. The City moves for summary judgment, arguing that Plaintiff cannot prove disparate treatment because of a lack of comparators, and that the record establishes non-discriminatory, non-pretextual reasons he was not permanently hired. Because I conclude that Plaintiff can prove disparate treatment without citing to comparators, and because there are issues of fact with respect to the role played by this religious disagreement in the hiring process, the City's motion must be denied.

1

## I. Relevant Facts

Plaintiff was one of a class of five Construction Code Specialist Trainees ("Trainee") that began around August 22, 2012. He had previously worked as an electrician, and his qualifications are not questioned. The usual process for L & I Inspectors before achieving full-time status is to complete six months as a Trainee, during which they may be removed "at any time" because they are not yet subject to the City's Civil Service Regulations. *See* Def.'s First Mot. 13, ECF No. 32 [hereinafter "Def.'s Mot."].

Plaintiff's duties consisted of learning to perform field inspections through classes, required exams, and critically, accompanying (and assisting) higher level inspectors to and through a number of assignments. Plaintiff was based out of and took his classes at the Municipal Services Building at 1401 JFK Boulevard. From there, he rotated across L & I's five district offices: North, South, East, West, and Central. The Districts were overseen by District Supervisors who in turn reported to the Construction Services Manager. Rotations consisted of Trainees effectively shadowing full-fledged inspectors in the various districts. These inspectors would instruct Trainees for the day and provide feedback about the Trainees' performance to their respective supervisors, and could go up the ladder to have Trainees disciplined, if needed. *See id.* at ¶¶ 6–7.

For all practical purposes, Construction Services Manager Gerard James ("Manager James") ultimately decided whether a Trainee would be hired at the end of the probationary process.[1] He testified that he bases this decision on informal consultations with District Supervisors and Inspectors, and gives the reports he receives from those individuals "a lot of

---

[1] Although technically Mr. James needs the approval of the Deputy Commissioner or the Director of Human Resources, Pl.'s Resp. Br. Ex. C, at 44:9–18, ECF No. 35-10 [hereinafter "Pl.'s Resp."], his opinion or recommendation with respect to terminating an employee has always been accepted. *See id.* at 64:16–20.

weight" because "they are on the ground." Pl.'s Resp. Br. Ex. C, at 10:19–22, ECF No. 35-10 [hereinafter "Pl.'s Resp."]. Robert Keenan, then-West District Inspector, described the process at that district: "[A] supervisor will come out into the bullpen, for lack of a better term, and say, you know, I have to go through this [process], do you guys have any concerns?" Pl.'s Resp. Ex. H, at 28:3, ECF No. 35-15. The supervisor would then proceed to go through a list of names, noting who had a concern about whom and why. *Id.* at 28:8–20.

The record shows that West District Inspector Kevin Szychulski,[2] and others who might have been swayed by him, expressed negative opinions about Plaintiff. Plaintiff testified that during his three days in that District, Szychulski handed him prayer cards and asked him to pray to the Saints on the cards.[3] Plaintiff testified that Szychulski did this to him every morning, and when he told Brett Martin, who supervised some of Plaintiff's classes, and District Supervisor John McFarlane, they asked, "Well, do you want to file a complaint with the EEOC?" Pl.'s Resp. Ex. A-1, at 57:13–58:7, ECF No. 35-4. Each time Plaintiff responded, "No, I do not want to rock the boat. I do not want to get anybody fired." *Id.*

Finally, on the third day of Szychulski asking Plaintiff about the prayers in front of everyone, Plaintiff said "I pray every day." *Id.* at 97–100:12 (emphasizing that "I don't pray the prayers that he hands me, but I pray every day"). In another instance, Plaintiff testified that Szychulski asked him whether he owned a gun, in what Plaintiff interpreted as an attempt to belittle him in front of others. Plaintiff responded, "[N]o, I do not own a gun. . . . I don't believe in guns," *id.* at 95–97:2, and then followed up by sarcastically asking Szychulski whether "he[,

---

[2] When Plaintiff was at West District, he sat directly behind Mr. Szychulski. Pl.'s Resp. Ex. J, at 10:15, ECF No. 35-17. Szychulski has since left L & I for a position with the Sprinklers Fitter Union. *See* Def.'s Mot. 4 n.2, ECF No. 32.

[3] Within the Catholic tradition, prayer cards, otherwise known as "Holy Cards," are printed devotional items that typically carry religious-themed images, such as the portrait of a saint, with the reverse side setting forth a prayer or quote from the Bible.

3

Szychulski,] would have a priest bless his gun," *id.* at 101–02. Plaintiff testified that Szychulski then clenched his fists, turned red, and went back to his desk and glared at Plaintiff. *Id.* at 102:24–103:8. Plaintiff further testified that Craig Jagaczewski, then another trainee but now a supervisor, later told Plaintiff that Szychulski at that point began telling people that Plaintiff was a mole placed in the Department to help investigate possible corruption, further stating that Plaintiff tried to set Szychulski up by having a plumber give Szychulski a gift card. *Id.* at 104:14–21.

For his part, Szychulski purportedly recalled little of this, but did admit that he likely offered prayer cards to Plaintiff. Pl.'s Resp. Ex. B, at 23:22–24, ECF No. 35-9. He testified that he did not "harbor any specific ill will towards [Plaintiff]." *Id.* at 38–39. When asked if he had any verbal disagreements with Plaintiff in the work place, he equivocated: "Probably, but I don't know." *Id.* at 30:2–4. He responded in a similarly tentative way when asked if he spoke to Manager James about Plaintiff, *id.* at 35:22–24, or when asked whether he told other colleagues Plaintiff was a "mole," despite the serious negative connotations necessarily associated with the accusation,[4] *id.* at 32:11–14. He remembered his concern that Plaintiff allegedly offered him a gift card, and further testified that, at that same job, Plaintiff left without asking. *Id.* at 38.

Szychulski's penchant for evangelizing was apparently well known. He was described by the supervisor of the district, John McFarlane, as a "zealot" who likes to proselytize, and "one of those people who [sic] that it's his way or everybody else is going to hell." Pl.'s Resp. Ex. F, at 12:10–24, 13:1–5, ECF No. 35-13. Szychulski testified that he took into consideration his understanding of a fellow employee's religious affiliation before approaching him:

---

[4] Specifically, Keenan testified that "there was a lot of stress" in the Department at the time, and a lot of speculation about internal affairs issues. Pl.'s Resp. Ex. H, at 22, ECF No. 35-15.

4

> My understanding was that Mr. Smith was a lector at church.[5] I heard that before he even came at the office. So my impression was that he was going to be a very devout, strong Catholic. That's the only reason I would even say anything to anybody, is knowing where they stand in their religio[n]. That's all I have for that.[6]

Def.'s Mot. Ex. 5, at 67:20–68:7, ECF No. 32-5. And an assumed commonality of belief apparently gave Szychulski confidence that his views would be well-received:

> The word Catholic means universal. If you do not believe what the Catholic Church teaches, you're actually not a Catholic anymore. ... When I'm speaking to a fellow Catholic, I'm under the impression that they fall under magisterial, and Rome who makes all the doctrine and dogma, which is what we're supposed to be following and believing. Again, if you do not believe that, then you become a personal believing religion.

*Id.* at 66–70.

Szychulski had equal confidence that his views should not cause any consternation to a fellow Catholic. When pressed as to whether he believed it reasonable that Plaintiff could have been offended, he replied, "Yes, anything is possible. . . . [B]ut if you don't believe in what the Catholic church teaches, you're not a Catholic. You really shouldn't be offended by it." *Id.* at 66:23–67:1. The potential for intra-sectarian conflict was underscored by the testimony of fellow Inspector (now supervisor) Glen Guadalupe, who stated that he understood Plaintiff and Szychulski both to be very religious. Pl.'s Resp. Ex. D, at 11:1–7, ECF No. 35-11 ("Kevin is a die-hard . . . and Carl seems to be."). And Supervisor Robert Keenan testified that "Carl . . . and Kevin are both very strong-minded on how they discuss issues." Pl.'s Resp. Ex. H, at 46:1–5, ECF No. 35-15.

The parties hotly dispute whether the foregoing altercation had anything to do with Plaintiff's discharge. Plaintiff's termination notice stated that the termination was due to

---

[5] It appears from the record that Plaintiff was in fact a lector at one point. Pl.'s Resp. Ex. A-2, at P4, ECF No. 35-5.

[6] Szychulski also testified that "the only reason [he] would even say anything to anybody is [if he knew] where they [stood] in their religion." Pl.'s Resp. Ex. B, at 16:24–17:1, ECF No. 32-9.

Plaintiff (i) questioning others' integrity, responsibility, professionalism, and experience during his training through the field district offices and his innuendos, unacceptable remarks, accusations and behind the back questioning of some supervisors and inspectors; and (ii) removing himself from training. *See* Def.'s Mot. Ex. D010, ECF No. 32-4. But there is a question as to whether the negative views of Plaintiff all originated with Mr. Szychulski.

Most of the evidence concerning Plaintiff's performance during this period was positive. Mr. Keenan testified that he recommended that Plaintiff be hired, Pl.'s Resp. Ex. H, at 26:5, ECF No. 35-15, as did Glen Guadalupe, now a Supervisor but then a full-time Inspector in the South District, Pl.'s Resp. Ex. D, at 13:5–16, ECF No. 35-11, stating that on about five trips where Plaintiff shadowed him, he had no concerns about Plaintiff becoming an Inspector.[7] Then-Central District Supervisor Perry Cocco testified that he also recommended Smith's hire.[8] Specifically, he directly told Manager James that Plaintiff "did everything he was supposed to do," and he knew of no Supervisors that had any issues with Plaintiff. Pl.'s Resp. Ex. I, at 14:2–8, ECF No. 35-16. John McFarlane, who supervised the West District at the time, worked with Plaintiff personally, and because he could not verify any of the allegations against Plaintiff, testified that he also recommended hiring Plaintiff. Pl.'s Resp. Ex. F, at 29:19–30:12, ECF No. 35-13. McFarlane's support is of potential significance because Keenan pointed out that when he went through the same probationary process earlier, though many opposed him, he was

---

[7] Guadalupe also testified that he disagreed with Manager James and some of his colleagues' methods of evaluation because they required no documentation, and called for employees to base their evaluations on how they felt about the person, not whether the person could adequately perform. *See* Pl.'s Resp. Ex. D, at 15–19, ECF No. 35-11.

[8] Supervisors rotate across Districts. Pl.'s Resp. Ex. C, at 16:10–11, ECF No. 35-10. Cocco has been in the employ of L & I for 22 years, was a District Supervisor since 1999, and is currently in that role for the East District. Pl.'s Resp. Ex. I, at 9–10, ECF No. 35-16. His testimony here directly contradicts Manager James's belief that Cocco made a recommendation to terminate Plaintiff. *See* Pl.'s Resp. Ex. C, at 15:13–24, ECF No. 35-10.

6

ultimately hired because of McFarlane's recommendation. Pl.'s Resp. Ex. H, at 32:18-23, 43:15–24, ECF No. 35-15. As result, Keenan testified, "I do not know what happened with Carl." *Id.* at 44:1.

Manager James testified that Plaintiff "did fine" with the training program, but essentially was terminated on account of his demeanor—"kind of an attitude type thing more so than anything." Pl.'s Resp. Ex. C, at 13:14–23, 17:21–24, ECF No. 35-10. But James also testified that "everything in the document was based on commentary received." *Id.* at 41:2–8. Specifically, he purportedly placed some emphasis on the fact that Brett Martin recommended Plaintiff's termination, since Martin supervised some of Plaintiff's classes and was "especially involved" with the process of Plaintiff's termination. *Id.* at 13:6–14:10. But Martin in turn testified that he gave no input as to whether Plaintiff should be fired. Pl.'s Resp. Ex. G, at 7:9–11, ECF No. 35-14. And when Martin was asked about his understanding of what performance issues led to Plaintiff's termination, he cited a conversation where Manager James referred to the altercation with Szychulski.

> My understanding was the fact that there was an event with Mr. Szychulski and that it had to do with a religious issue. I don't have the details. . . . It was a very generalized statement that there was an event that happened between Mr. Smith and Mr. Szychulski and it had to do with religion.

*Id.* at 43:2–5, 44:1–17, 46:1–8. Guadalupe also testified that he believed that whatever happened in West District was "relevant or big enough." Pl.'s Resp. Ex. D, at 13:1–16, ECF No. 35-11. Keenan also testified that he believes that there were some "highly charged" religious debates between Szychulski and Plaintiff, and that Szychulski did not have high regards for Plaintiff as an Inspector. Pl.'s Resp. Ex. H, at 20–21:5, ECF No. 35-15.

Indeed, others recall Szychulski's impression of Plaintiff as explicitly negative. Manager James noted that at one point, Szychulski told him that Plaintiff was disruptive, and did not

7

elaborate further than stating that Plaintiff was "just an idiot." Pl.'s Resp. Ex. C, at 20:15–24, ECF No. 35-10. And it would seem that Szychulski was likely the source of the criticism that Plaintiff had left a job site without permission.[9] Another West District Inspector, John Lech, specifically recalled that Szychulski was "pretty open" about his dislike for Plaintiff, and that Szychulski may have started the rumor that Plaintiff was a mole investigating misconduct. Pl.'s Resp. Ex. J, at 32–36, ECF No. 35-17.

West District Supervisor McFarlane testified that Szychulski was upset that Plaintiff pointed out something to a contractor that Szychulski had already addressed, and thereafter called Plaintiff "coarse." Pl.'s Resp. Ex. F, at 9–10, ECF No. 35-13. McFarlane also testified that Szychulski made it clear that he did not like Plaintiff, and was "heated" about working with him. *Id.* at 11. He further testified that Inspectors Szychulski, Lech, and Gabe Spinosi—all West District Inspectors and allegedly close friends—said Plaintiff tended to interrupt them when they were doing their inspections, and therefore did not think Plaintiff was a good fit. *Id.* at 29–30. McFarlane reported this in an e-mail to Manager James, but simultaneously recommended that Plaintiff be hired because he personally took Plaintiff out in the field and could not verify the allegations. *Id.* at 30–32 (stating that he did not necessarily expect Plaintiff to be fired "because historically we tried to keep as many people as we could because we're short-staffed").

## II. Standard

This motion is controlled by the well-established standard for summary judgment under Fed. R. Civ. P. 56(a), as amplified by *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

---

[9] Manager James remembers that Szychulski was present during some meetings concerning Plaintiff's performance and attitude, *id.* at 50:20–51:1, and Szychulski testified that he is "pretty sure" that he was the one who reported Plaintiff leaving, Pl.'s Resp. Ex. B, at 22:14–23:8, ECF No. 35-9.

8

## III. Claims for Religious Discrimination under Title VII

In relevant part, Title VII provides that it is an unlawful employment practice for an employer "to discharge any individual because of such individual's religion," among other protected characteristics. 42 U.S.C. § 2000e-2(a)(1).[10] Such claims can involve either disparate treatment or failure to accommodate, *see Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 281 (3d Cir. 2001), but this case only involves the former.

Individual disparate treatment claims are subject to the *McDonnell Douglas* burden-shifting framework established by the Supreme Court. For claims of religious discrimination, the lead case in the Third Circuit is *Abramson*, which the City argues requires proof that comparable employees were treated differently. I do not read *Abramson* as imposing such a requirement. The language the City cites as the controlling test merely sets forth the typical means by which an employee proves a *prima facie* case.[11] In *Pivirotto v. Innovative Systems, Incorporated*, 191 F.3d 344, 357 (3d Cir. 1999), a case addressing gender discrimination under Title VII, the Court of Appeals made clear that comparator evidence is not always required. There, the Court rejected an instruction requiring the jury to find that plaintiff was replaced by someone outside of her protected class in order to prevail. It held that an employee can also prevail by showing that the employer had a continued need for someone to perform the same work. 191 F.3d at 354. Indeed, the Third Circuit's analysis in *Pivirotto* closely tracked the language used by the Supreme Court in the seminal case of *McDonnell Douglas Corporation v.*

---

[10] I jointly analyze Plaintiff's Title VII and Pennsylvania Human Rights Act (PHRA) claims because the standards are the same in the employment discrimination context. *Tourtellotte v. Eli Lilly & Co.*, 636 Fed.Appx. 831, 845 (3d Cir. 2016) (citing *Weston v. Pennsylvania*, 251 F.3d 420, 426, 433 n.3 (3d Cir. 2001)).

[11] The City's confusion as to whether comparator evidence is necessary under Title VII is rooted in a failure to distinguish dicta from holding. Such confusion has been an issue before in this Circuit. Ernest F. Lidge III, *The Courts' Misuse of the Similarly Situated Concept in Employment Discrimination Law*, 67 Mo. L. Rev. 831, 840 (2002).

9

*Green*, 411 U.S. 792, 802 (1973), which did impose a requirement of comparator evidence.

As the Supreme Court described the *McDonnell Douglas* framework, it "was not intended to be an inflexible rule. . . . A prima facie case under [*McDonnell*] raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 575 (1978). *See also Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (explaining that even within sex discrimination claims, establishing a prima facie case for pregnancy discrimination differs from that of gender discrimination); *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999) ("A prima facie case cannot be established on a one-size-fits-all basis."). Accordingly, the test for Title VII claims based upon religious discrimination is no different than for Title VII claims generally. A plaintiff may satisfy the fourth element of the *McDonnell Douglas* test by showing *either* that a similarly situated person outside of the protected class was treated more favorably, *or*, that the circumstances of the adverse action give rise to the inference of discrimination.[12]

## IV. Discussion

There is no dispute that Plaintiff was qualified, protected, and suffered an adverse employment action. There is evidence from which a reasonable jury could conclude that Szychulski did not want Plaintiff hired, that this animus had its roots in Plaintiff's rejection of Szychulski's religious overtures, and that Szychulski's input into the decision-making process played a determinative role in the decision not to hire Plaintiff. Plaintiff need not show that the actual decision-makers harbored discriminatory animus, only that they were influenced by it.

---

[12] In response to the City's formulation of the controlling standard, Plaintiff argues that I should look to the Tenth Circuit's decision in *Shapolia v. Los Alamos Nat. Lab.*, 992 F.2d 1033, 1038 (10th Cir. 1993), which endorsed a flexible test in cases alleging religious discrimination. Given *Pivirotto*, I see no need to look outside the Third Circuit, and as noted above, the test as set forth in *Pivirotto* mirrors *McDonnell Douglas*.

10

*Abramson,* 260 F.3d at 286. A reasonable jury could therefore conclude that Szychulski influenced the City to dismiss Plaintiff on account of an impermissible purpose: Plaintiff's rejection of his superior's more stringent religious views.

The City's burden at this juncture is "to introduce evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action," *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509 (1993), a burden the Third Circuit describes as "relatively light," *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994).

The City proffers that, like other Trainees, Plaintiff was expected to follow his assigned inspectors and take direction. Def.'s Mot. 13, ECF No. 32. But, the City argues, Plaintiff had disruptive, non-compliant interactions with inspectors. *Id.* (citing Def.'s Mot. Ex. 4, ECF No. 32-4). In addition, the rejection notice indicated that "Plaintiff removed [himself] from a training process to proceed on his own at a job site/inspection area." *Id.* at 14. The City further argues that an inference of discrimination does not exist here because all employees involved in the decision to terminate Plaintiff, including Szychulski, were the same religion as Plaintiff; Plaintiff only worked with Szychulski for three days; and there is no evidence of Szychulski treating someone similarly situated to Plaintiff differently than he treated Plaintiff.

The probationary context also helps explain why the City acted when it did. Under its Civil Service Regulations, employees like Plaintiff "who are appointed from open competitive, promotional or preferred eligible lists, are subject to a probationary period of six months." Def.'s Mot. 13, ECF No. 32 (citing Phila. Civ. Serv. Regs. § 14.01). And during this period, "the appointing authority may determine that such employee is unable or unwilling to perform his/her duties satisfactorily." *Id.* This determination is not subject to the City's appeal process. *See* Def.'s Mot. Ex. 4, ECF No. 32-4. Thus, to avoid the need for the more costly and cumbersome

11

appeal process, the City understandably prefers to use the six-month period for gatekeeping—that is, to most closely evaluate and weed out any employees that show signs of behavior that could be problematic in the future.

Taken as true, the foregoing represent legitimate non-discriminatory reasons for discharging Plaintiff. The burden of production therefore "rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual." *Fuentes*, 32 F.3d at 763.

Much of the City's defense rests upon a lack of comparators, which I have rejected as a requirement on the facts here. Beyond that, however, the principal weakness in the City's position is that the testimony concerning Plaintiff's dismissal is replete with inconsistencies and contradictions, and a jury could conclude that the negative reviews trace back to Mr. Szychulski.

The reasons listed in the Rejection Notice can be summed up in two parts: (i) Plaintiff's behavior consisting of innuendos, unacceptable remarks, accusations, and behind the back questioning of some supervisors and inspectors, and (ii) Plaintiff leaving a jobsite/inspection area.

To the first, Manager James testified that everything he placed in the Rejection Notice was information that he obtained from district supervisors and inspectors, because "they are on the ground." Yet the record is devoid of testimony recommending that Plaintiff be discharged on any basis, aside from the three West District inspectors: Szychulski, Lech, and Spinosi, a notably tight-knit group. This is compounded by the fact that the District Supervisor of West District, McFarlane, investigated these allegations, could not substantiate them, and therefore recommended Plaintiff's hire. Moreover, Manager James testified that Brett Martin was especially involved in Plaintiff's discharge process and recommended Plaintiff's discharge,

12

whereas Martin testified that he had no input, and from what James told him before Plaintiff's discharge, the religious argument between Plaintiff and Szychulski played a role in the decision. Another Inspector, Guadulupe testified to the same: that the confrontation involving religious issues must have played a role. And to the extent there was suspicion that Plaintiff was working undercover seeking to entrap fellow employees, there is also evidence from which a jury could conclude that the rumors started with Szychulski.

As to the second issue, leaving a worksite, Plaintiff explains that his departure was with permission, that it was only for two minutes to use the restroom, and that he explained that to Manager James. Def.'s Mot. Ex. 3, at 71–72:3, ECF No. 32-3. That absence was seemingly important to James, who approached Plaintiff to discuss that allegation with him. *See id.* at 71:19–22. Once again, however, the source of the complaint would appear to be Mr. Szychulski.

In many ways, this is a close case. Plaintiff spent only three days of his probationary period in the same district as Szychulski. The City is correct that not only were they both Catholic, but in this area of the Department, Catholics predominate to the point where the manager was hard-pressed to identify anyone who was not Catholic. Pl.'s Resp. Ex. C, at 18:12–19, 34:15–24, ECF No. 35-10. Discussion of religion in the workplace is not illegal, and viewed from one perspective an argument can be made that it was not a religious disagreement that fueled the animosity, but the sarcastic and purportedly disrespectful manner in which Plaintiff communicated his rejection of Szychulski's version of Catholicism. The record could certainly be interpreted as proving only that Mr. Smith and Mr. Szychulski were both strong-minded individuals, who had a personality clash.

On the other hand, intra-sectarian disputes can be highly charged, whether one looks to the historic example of the Reformation or the ongoing Sunni-Shia divide in Islam. And Title

VII does not require proof of religious persecution. Rather, it makes it unlawful to base hiring decisions on an employee's religion. On balance, there is evidence from which a jury could reasonably conclude that Szychulski's criticism of Plaintiff was the moving force in his not being offered permanent employment. If that were the case, and if Szychulski's criticism was in fact based upon Plaintiff's religious beliefs, such conduct would violate Title VII. Accordingly, the City's motion must be denied.

/s/ Gerald Austin McHugh
Gerald Austin McHugh
United States District Judge